UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SYLVIA  WISEMAN,                                )
                                                )
                         Plaintiff,             )
                                                )
           vs.                                  )              1:12-cv-01337-SEB-DML
                                                )
PRUDENTIAL INSURANCE COMPANY   )
OF AMERICA,                                     )
CNO SERVICES, LLC GROUP              )
INSURANCE PLAN,                            )
                                                )
                         Defendants.        )

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on cross-motions for summary judgment [Docket

Nos. 35 and 38], both filed on September 19, 2013, by Plaintiff Sylvia Wiseman and

Defendants Prudential Insurance Company of America ("Prudential") and Conseco

("CNO") Services, LLC Group Insurance Plan ("the Plan") (collectively, "Defendants").

Ms. Wiseman alleges that Prudential wrongfully terminated her short term disability

benefits and denied her long term disability benefits, in violation of the Employee

Retirement Income Security Act of 1974 (ĂERISA®), 29 U.S.C. ' 1001 *et seq*.

Defendants contend that Prudential's decisions were not arbitrary and capricious and that

it fully satisfied its obligations under the Plan by providing Ms. Wiseman a full and fair

review of her claim.  For the reasons detailed in this entry, we <u>DENY</u> Plaintiff=s Motion

for Summary Judgment and <u>GRANT</u> Defendants' Motion for Summary Judgment.

## **Factual Background**

In 2002, Plaintiff Sylvia Wiseman began working for CNO Services, LLC ("CNO"). As a full-time employee, Ms. Wiseman was enrolled in the CNO Services, LLC Group Insurance Plan ("the Plan"), a welfare benefit plan governed by ERISA which provides both short term and long term disability benefits to employees of CNO Services, LLC. The short term disability component of the Plan ("STD Policy") is implemented through an Administrative Services Agreement between Defendant Prudential and CNO. The long term disability component of the Plan ("LTD Policy") is insured by Prudential. Defendant Prudential administers both the STD Policy and the LTD Policy. CNO is financially responsible for benefits paid under the STD Policy and Prudential pays the benefits under the LTD Policy.

The Plan, as amended and restated, has an effective date of January 1, 2010, and provides:

> Section 5.3. Benefit Determinations. Because benefits under the Plan are only paid to the extent an Insurer determines benefits are payable under a Policy, an Insurer will be the Plan's claim administrator and named appeals fiduciary with respect to the benefits provided under the Policy it issues for the Plan. Consequently, the Insurer will determine the timing and amount of payments to be made under the Policy it issued and this Plan. A Participant or beneficiary may request a review of any determination made by an insurer upon written request to the Insurer. The Insurer will then afford the claimant a full and fair review of such a request.

> Section 5.4. Company Decision Final. The Company is empowered to, and will, interpret the Plan and decide all questions concerning the Plan and the eligibility of any person to participate in or benefit under the Plan, other than benefit claims determined by an Insurer under Section 5.3. Any interpretation of the provisions of the Plan and any decisions on any matter made by the Company in good faith shall be final and binding on all persons. Consequently, benefits under the Plan will be paid only if the

Company or the applicable Insurer decides in its discretion that the applicant is entitled to them.  When making a determination, the Company may rely upon information furnished by an Employer, an employee, the Insurer, the third party administrator or the Company's legal counsel.  A misstatement or other mistake of fact shall be corrected when it becomes known and the Company shall make such adjustment on account thereof as it considers equitable and practicable.

R. at 121.

**The STD Policy**

The STD Policy provides benefits to qualified employees for up to ninety days.  If the employee remains disabled beyond ninety days, the LTD Policy provides benefits to qualified individuals for specified periods thereafter.  Under the STD Policy, disability is defined as follows:

Section 3.2.  Disability.  In order to qualify for STD benefits, the Participant must (1) be unable to work in his regular job due to illness or injury, (2) complete an application for STD benefits and submit the application to his Employer's human resource department for approval, (3) be under a physician's care and (4) provide all requested documentation (that the Company deems sufficient) to verify the nature and extent of the disability.  The Company may require, in its sole discretion, a medical opinion from a physician of its choice stating that the Participant is unable to work.  The Company may also require the Associate to provide additional medical documentation during the period of disability.

R. at 137.

The STD Policy further provides:

Section 3.4.  Family Medical Leave Act.  A Participant who qualifies for leave under the Family Medical Leave Act due to his own qualifying medical condition will be eligible for STD benefits during the medically necessary portion of his leave.

…

3

> Section 4.4.  Company Decision Final.  The Company is empowered to, and will, interpret the Plan and decide all questions concerning the Plan (including questions of fact relating to any benefit payable by or claim asserted against the Plan) and the eligibility of any person to participate in or benefit under the Plan.  Any interpretation of the provisions of the Plan and any decisions on any matter made by the Company in good faith will be final and binding on all persons.  When making a determination, the Company may rely upon information furnished by an Employer, an employee, the third party administrator or the Company's legal counsel.  A misstatement or other mistake of fact will be corrected when it becomes known and the Company will make any adjustment it considers equitable and practicable.

R. at 138, 139.

In connection with the STD Policy, CNO entered into an Administrative Services Agreement with Prudential, effective January 1, 2010.  That agreement provides that Prudential agrees to perform administrative functions with respect to claims submitted under the STD Policy, including claims processing, determination of eligibility of benefits, claim determination, communication of decisions, appeals of claim denials, claim investigations, and vendor services.  R. at 65-67.

**The LTD Policy**

The LTD Policy provides LTD benefits to eligible employees who meet all contractual provisions.  Prudential insures the LTD Policy and performs certain administrative functions with respect to claims filed pursuant to the LTD Policy.  As claim administrator, Prudential has "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits."  R. at 46.

The LTD Policy defines disability as follows:

You are disabled when Prudential determines that:

- you are unable to perform the ***material and substantial duties*** of your ***regular occupation*** due to your ***sickness*** or ***injury***; and
- you are under the ***regular care*** of a ***doctor***; and
- you have a 20% or more loss in your ***monthly earnings*** due to that sickness or injury.

  After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:

- you are unable to perform the duties of any ***gainful occupation*** for which you are reasonably fitted by education, training or experience; and
- you are under the regular care of a doctor.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

Prudential will assess your ability to work and the extent to which you are able to work by considering the facts and opinions from:

- your doctors; and
- doctors, other medical practitioners or vocational experts of our choice.

…

***Material and substantial duties*** means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

***Regular occupation*** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

R. at 15 (emphasis in original).

**Plaintiff's Claim for STD Benefits**

Ms. Wiseman began working for CNO in 2002 as a Business Consultant. In her role as Business Consultant, Ms. Wiseman's "Key Job Responsibilities and Accountabilities" according to the job description were as follows:

- Works as liaison among stakeholders in order to elicit, analyze, communicate, and validate requirements for changes to business processes, policies, and information systems.
- Partners with Project Manager on high priority projects to drive the projects to successful conclusion assisting as needed.
- Conducts peer reviews of other [business analysts'] work products.
- Manages the business relationships for business analysis efforts.
- May be required to direct the work of other business analysts.
- May be called upon to fill Project Manager role for less complex projects.

R. at 340. As a Business Consultant, Ms. Wiseman was also responsible for the following "Critical Decisions/Recommendations":

- Determines the appropriateness and identifies opportunities for improvement of business requirements by conducting peer reviews.
- Makes decision as to the who, what, when, for meetings, approvals, escalations, communications, etc.

*Id.*

CNO has a general policy that its employees may not work more than one day per week from home. However, for a number of years, CNO made an exception for Ms. Wiseman who has a history of suffering from a number of medical conditions, including fibromyalgia, arthritis, back pain, cardiomyopathy, atypical chest pain, hypothyroidism, morbid obesity, and obstructive sleep apnea. Because of Ms. Wiseman's medical conditions, her manager received clearance for her to work full-time from home most

work weeks until July 2011. Thus, between July 2007 and July 2011, Ms. Wiseman was not performing the duties described above directly, but instead managed a team of business analysts under the title of Supervisor. According to Ms. Wiseman, even with these accommodations, she struggled to meet the essential duties of her position because of increasing pain and fatigue, and, as early as November 2010, she told one of her treating physicians that she did not believe she could manage much longer.

In July 2011, Ms. Wiseman's department was restructured, which resulted in her assuming all of the duties contained in the job description for the Business Consultant position. The duties of Ms. Wiseman's restructured job required her to be on site with increasing frequency and her work hours increased as well (50-55 hours per week). According to Ms. Wiseman, these changes caused her pain and fatigue to escalate to unmanageable levels.[1] After a few months working in the restructured position, on October 6, 2011, Ms. Wiseman called Prudential and made an oral application for STD benefits. At that time, she reported that she would be out of work starting October 10, 2011 as a result of fibromyalgia. R. at 814. Ms. Wiseman did not indicate a date on which she planned to return to work. *Id.* On October 7, 2011, Ms. Wiseman ceased reporting to work and stated that she was seeking a new primary care physician. R. at 698-99.

---

[1] Prudential's notes indicate, for example, that Ms. Wiseman expressed fatigue related to working outside the home because she could no longer "roll out of bed and work in pajamas. Now has to go to copy machine, etc." R. at 694.

In support of her claim for STD benefits, Ms. Wiseman submitted documentation from Lynette Green-Mack, M.D., one physician who treated Ms. Wiseman for pain related to fibromyalgia as well as other ailments. Dr. Green-Mack faxed an Attending Physician Statement ("APS") to Prudential that asserted a disability date of October 10, 2011. The APS cited "cardiomyopathy and restricted lung disease" as the "nature of medical impairment" and described "other relevant medical facts related to the condition for which employee seeks leave" as follows:

> Patient has DX: MFRS/FMS, lumbosacral spondylosis, inflammation of sacroiliac joint, and nonaliopathic lesion of sacral region. Patient has severe low back pain. Pain is constant, right hip gives way with walking. Has diffuse pain in both shoulders, wrists, elbows, hips, knees and ankles since 1986.

R. at 147. Dr. Green-Mack listed Ms. Wiseman's "expected return to work date" as January 2, 2012. Dr. Green-Mack also noted that Ms. Wiseman's "medical obstacles to return to work" included "physical limitations due to obesity, diminished capacities to walk long distances; oxygen and back." R. at 146-47.

On October 17, 2011, Prudential approved Ms. Wiseman for leave under the Family Medical Leave Act ("FMLA") for the period of October 10, 2011 to November 4, 2011, and later extended FMLA benefits through December 30, 2012. However, Prudential called Ms. Wiseman that same day to inform her that it was unable to make a decision on her STD benefits claim based solely on the information submitted by Dr. Green-Mack. During that telephone call, Ms. Wiseman identified the following treating physicians: Dr. Green-Mack, Charles Simchak, M.D. (neurologist), Patrick Foley, M.D.

(primary care provider), and Jaqueline Hess, Psy.D. (clinical psychologist). Prudential requested that Ms. Wiseman submit recent medical records from each identified health care provider. Each provider supplied the requested records, which are summarized below.

**Plaintiff's Medical Records**

Medical records from Dr. Green-Mack show that Ms. Wiseman began seeing Dr. Green-Mack on a monthly basis in March 2011 initially for "Fibromyalgia, Lower Back Pain." Ms. Wiseman reported to Dr. Green-Mack that one of her goals in seeking treatment was to "work outside the home." *E.g.*, R. at 429. On August 8, 2011, Dr. Green-Mack noted that Ms. Wiseman "did not do aquatic therapy." R. at 697. Examination notes taken by Dr. Green-Mack on September 9, 2011 indicate that Ms. Wiseman had also stopped attending physical therapy because of the increased demands related to the restructuring of her position. R. at 429. A September 29, 2011 Physical Therapy Discharge Report confirms that Ms. Wiseman had called on September 9 "and left [a] message asking to be discharged." R. at 698. The report further stated that Ms. Wiseman "did not say why she no longer wanted to continue. She met all of her pain goals and was going to be discharged in early to mid-September anyway." *Id.* In an earlier report from July 25, 2011, Ms. Wiseman's physical therapist opined that "Obesity is the primary factor in the patient's low back pain. If she does not lose weight, physical therapy will provide her minimal benefits." R. at 697-98

Ms. Wiseman saw Dr. Simchak three times in 2011: on April 20, 2011, August 31, 2011, and November 29, 2011.  Dr. Simchak's notes indicate that Ms. Wiseman exhibited symptoms of "shortness of breath, chronic pain and memory loss" during those examinations.  R. at 542-46.  Dr. Simchak opined that Ms. Wiseman suffered from chronic pain disorder including fibromyalgia; a history of phantosmia; hypertension; a history of hypercoaguable state; and memory loss.  On November 29, 2011, Dr. Simchak noted that Ms. Wiseman had neuropsyche testing "which showed no evidence of a neurocognitive decline or neurodegenerative disease."  R. at 228.  On that same date he also noted: "At this point she probably would not do well retraining for work given her overall medical condition.  We will continue with supportive care."  *Id.*

Dr. Foley's records indicate that Ms. Wiseman saw him a total of six times between February 23, 2010 and March 14, 2011 for general health issues (including ear discomfort, a three-day cough, knee injury, and removal of skin lesions) as well as preventive care.  On November 16, 2010, Dr. Foley gave Ms. Wiseman a general physical exam.  After the examination, Dr. Foley opined in part as follows:

> 53 year old comes in today for a physical examination.  Had previously sent
> me a 4-page letter describing her illnesses.  She has multiple medical
> problems and she is followed by multiple doctors.  She sees a pain doc
> every 6 months for fibromyalgia pain.  She sees a cardiologist every year
> for a history of restrictive cardiomyopathy and pulmonary HTN.  She sees a
> pulmonologist once a year for previous history of bilateral pulmonary
> emboli and pulmonary HTN.  She sees an endocrinologist once a year for a
> previous history of hypothyroidism.  She sees a hematologist every 6
> months for chronic anticoagulation secondary to her previous PE.  She sees
> a neurologist every 3 months for her fibromyalgia.  She is complaining of
> fatigue all the time, stress related to her work.  She is morbidly obese and

has been unable to lose weight through multiple weight reduction programs. She reports that her BP's run consistently less than 140/90.

…

She follows no diet. She gets minimal exercise. … HT. 5'4". WT. 333 lbs.

…

I explained to her that I felt that the majority of her symptoms that she related to me in her letter were related to depression, probably related to her work stress and her multiple medical problems. I recommended that we consider starting her on an antidepressant. She has been on antidepressants in the past and had side effects from them, was unable to take them.

…

In her letter she did express an interest in long term disability through her employer but I am not sure that that is such a good idea.

R. at 450-51. In March 2011, Dr. Foley noted that Ms. Wiseman "[s]topped thyroid medications 6 months ago d/t sweating" and did not "take Lasix or Spironolactone every day because she says it makes her lightheaded." R. at 696-97.

Ms. Wiseman was referred to Dr. Hess in June 2011 "with symptoms of memory difficulties, symptoms of depression, and extreme fatigue related to long-term pain and illness." R. at 468. On October 24, 2011, Dr. Hess reported that she believed Ms. Wiseman to be "an extremely motivated person who was struggling with not being able to balance work demands with family and self care because her energy was drained at the end of every work day." R. at 468. Dr. Hess further opined: "After struggling for seventeen years to manage her responsibilities at work and to do so at a level of excellence, [Ms. Wiseman] no longer had the physical stamina to do so. Because of this struggle and the constant struggle with breathing, and with pain, she is emotionally

affected as well." *Id.* According to Dr. Hess, although Ms. Wiseman's "ultimate goal" was to return to work, she was at that time "both physically and mentally exhausted." *Id.* Dr. Hess concluded by opining that Ms. Wiseman was experiencing "increased pain, decreased ability to maintain attention and concentration and increased symptoms of depressed mood as she struggles to maintain quality of life." *Id.*

**Plaintiff's ADL Questionnaire**

On November 6, 2011, Ms. Wiseman completed an "Activities of Daily Living Questionnaire" ("ADL") in which she described her physical state as follows:

> Constant intense chronic pain in lower back, legs, hips, feet. Pain throughout my body varies including shoulders, upper back, neck, chest wall – depending on weather. Cold weather & rapidly changing weather increases symptoms.
> Chronic tiredness/lack of energy.
> Stress-mental failure, memory problems related to constant pain & tiredness.
> I have numerous medical conditions that may contribute to these symptoms that prevent my ability to work at this time. I am on continuous oxygen as well which limits the amount of time I can work outside my home.

R. at 213, 215.

In response to the question on the ADL regarding "what part of your job can you not do and why," Ms. Wiseman wrote:

> Job demands physical stamina and ability to assimilate and analyze large complex amounts of information in relatively short period of time. Job requires me to visit customers in their location as well as communicate effectively. Walking around large buildings, travelling between campus locations, walking into and out of buildings to/from conference rooms. Employer typically restricts ability to work from home and demands that most interactions between business analyst and customers take place face to face. The chronic/increased pain from increased activity, working while

> fatigued, coping w/weather conditions has affected my concentration, analytical ability, verbal communications, technical writing skills, including ability to prepare workflows and other analysis models, decision making, ability to recall/retain details. Job is very detailed and complex. The resulting stress is increasing pain, fatigued, frustration, anxiety, even being focused while sitting is difficult. Exposure to weather affects pain and breathing, so I limit my exposure as I can.

R. at 213, 215. Finally, Ms. Wiseman checked "yes" in response to the question asking whether "you believe you will be able to return to work" on the ADL, stating: "I will need some type of rehabilitation to return to work. I think it is too soon for me to be able to answer this question. I think it is possible if given enough opportunity to change/improve health condition. My mind says yes, my body says no." R. at 219.

**Prudential's Approval of STD Benefits**

On December 1, 2011, Prudential approved Ms. Wiseman's claim for STD benefits from October 17, 2011 through January 1, 2012, noting that she had previously been approved for FMLA leave during that time period and the Plan provides that STD benefits will mirror FMLA approval. Prudential sent Ms. Wiseman a letter informing her that she would need to provide notification if she would not be returning to work on January 2, 2012. Consistent with this direction, on December 20, 2011, Ms. Wiseman notified Prudential that she was unable to return to work on January 2 and requested that her benefits be extended.

**Prudential's Termination of STD Benefits and Denial of LTD Benefits**

On December 29, 2011, Prudential contacted Ms. Wiseman to inform her that she was near the maximum allowance of STD benefits and requested that she complete a Comprehensive Claimant Statement ("CCS") in order to assess her eligibility for LTD benefits. Prudential also requested updated records from Ms. Wiseman's physicians as well as an education, training and experience questionnaire, and medical authorizations.

In response to Prudential's requests, on January 9, 2012, Ms. Wiseman submitted a CCS to support her application for LTD benefits. In that statement she described her condition and the medications she was taking as follows:

> Chronic intense pain and chronic stress accompanied by fatigue. Pain is from Fibromyalgia and back pain. It occurs throughout my body but on a daily basis is concentrated in my back, hips, legs, and feet.
>
> …
>
> In addition to constant intense Fibromyalgia pain throughout my body aggravated by stress, I also have:
>
> (1) heart disease, restrictive cardiomyopathy diagnosed in 2006;
>
> (2) pulmonary hypertension, diagnosed in 2005;
>
> (3) sleep apnea – 2009 appx;
>
> (4) hypercoaguable state diag 2003 after pulmonary emboli;
>
> (5) hypothyroidism – 2006 appx;
>
> (6) relux – 2005 appx;
>
> (7) chronic fatigue;
>
> (8) arthritis in spine/hips;
>
> (9) memory problems/stress;
>
> (10) phantosmia/seizures.
>
> Medications:
>
> (1) Opana 20 mg 3x day – for pain Fibromyalgia/Arthritis;

(2) hydrocodone 325/10 mg 4-5 x day – for pain;

(3) Flexeril 10 mg 1 x day bedtime – for back pain and sleep;

(4) Cerefolin NAC 1 tab at bedtime – help memory problems;

(5) Warfarin Sodium 8 mg day – blood clotting problems;

(6) Klor Con M2 1 x day – cramping from diuretic;

(7) Spironolactone 25 mg 1/day – water pill for heart disease;

(8) Isosorbide 60 mg 2x day – nitro time released for heart disease;

(9) nitro stat 4 mg as needed for chest pain;

(10) Furosemide 40 mg 1x day for heart disease – water pill;

(11) Pantoprazole sod dr 40 mg 1x day bedtime – for GERD;

(12) Armour thyroid 120 mg 1x day – under active thyroid;

(13) oxygen – continuous – 4 litres – low oxygen saturation w/activity and while sleeping;

(14) Bi-Pap – sleep apnea.

All anti-depressant and anti-seizure medications have been discontinued because I began to experience dangerous side effects (High Blood Pressure and seizures) as a result or other sensitivity.

R. at 234, 237.

In response to the question on the CCC regarding how her condition prevented her from working, Ms. Wiseman wrote:

I am in intense pain around the clock. The medications are not able to control the pain. I am also plagued with fatigue daily. I have been subject to pain for over 10 years and it has gotten progressively worse. Also, because I have become sensitive to anti-depressants and anti-seizure medications, I have not been able to take them. Because of the pain, my ability to recall information is impaired. Testing indicates that the stress from being in pain at the time is affecting my memory. I also am on oxygen.

…

I experience significant pain on a daily basis for most of the day. Every movement, getting up, sitting down, walking, turning and other movements increase the pain. Despite the powerful pain medications I am taking, I am not ever pain free. I am unable to take anti-inflammatory drugs due to a blood disorder.

My back, hips, legs, and feet are very painful without let up now for many months. In addition, I experience random flares of pain in other body members such as my neck, arms, chest, legs and fingers for periods of time. Last week for several days I could not turn my neck to the right. I also have significant fatigue on a daily basis along with sleep disturbance. I experience interrupted sleep due to back and hip pain and bouts of difficulty falling asleep as well. I am also an oxygen patient due to heart disease and pulmonary hypertension. I have oxygen with all activity and when I sleep as well – continuous. This health situation, along with other health conditions and demands of life, causes significant stress. Adding a work schedule and the demands of an occupation creates debilitating stress and pain and also makes it difficult to take the medication on-time. Even when I have to exert myself to go grocery shopping, to the doctor, or some other necessary event/business, it is followed by several hours of bed rest to recover. Weather changes and cold weather increases the pain, so the winter is my most difficult time of the year. And, this year, the always unpredictable and unstable weather patterns have been particularly difficult. Stress increases the pain. I have been experiencing ever increasing memory problems. I have trouble remembering how to do skills and use tools (software and techniques) that I have mastered. The primary job function requires the ability to absorb large amounts of information and keen analytical ability to analyze it amongst other physically and mentally demanding abilities.

R. at 235, 241.

On February 2, 2012, Prudential conducted a capacity and clinical review of all of the documentation submitted up to that date by Ms. Wiseman in support of her claim for disability benefits on the basis of fibromyalgia, lumbosacaral spondylosis, sacrolitis, and myalgia/mitosis. After reviewing Ms. Wiseman's file, Prudential concluded that her medical records did not document any "decreased bilateral lower extremity, motor strength, sensation, reflexes or gait abnormalities." R. at 701. Prudential further

concluded that there were "no diagnostic reports nor documented diagnostic results currently available with respect to [Ms. Wiseman's] lumbar spine.  Also, there are no documented referrals for diagnostic testing in regards to the above low back conditions." *Id.*  According to Prudential's notes, it believed that any difficulty Ms. Wiseman experienced with movement at the office could be accommodated by using ambulatory devices and oxygen machines.  R. at 694.  Prudential also noted that "the medical records have shown that [Ms. Wiseman] had been working [with] the above conditions for a long time prior to her going out of work."  *Id.*  Prudential determined that the records submitted by Ms. Wieseman did not support restrictions or limitations that would prevent her from performing her position, and that, rather than deteriorating with increased functional activity, her medical conditions might in fact improve with physical activity.

Upon completing its review of Ms. Wiseman's file, on February 3, 2012, Prudential terminated Ms. Wiseman's STD benefits effective January 2, 2012, and simultaneously denied her claim for LTD benefits.  In addition to telephoning Ms. Wiseman to inform her of its decision, Prudential sent Ms. Wiseman a letter reiterating the denial of her benefits and informing her of the procedures for appeal.  The denial letter begins by discussing each of the medical records and opinions of the medical professionals that Prudential considered in reaching its decision and then concludes as follows:

> Based on the currently available medical records and noted incongruities while we would expect limitations in mobility secondary to excess body weight, the medical record's objective findings would not restrict your functional capacity in regards to the above conditions, and we would expect

17

that you would be encouraged to remain as active as possible to promote reconditioning. Also, fibromyalgia is not a progressive or life threatening condition and will not worsen with increased functional activity.

…

Our review found that the objective information does not support a restriction of your functional capacity based on a physical, cognitive or psychological perspective. We would expect that you would be encouraged to remain as active as possible to promote reconditioning and continued weight loss. After a thorough evaluation of the above information, we have determined that you do not meet the definition of disability as defined above. Therefore, we have denied your claim.

R. at 763.

**Plaintiff's Appeal of Prudential's Denial Decision**

On July 17, 2012, Ms. Wiseman submitted a letter to Prudential through her current counsel, appealing the denial of benefits.[2] In that letter, Ms. Wiseman argued that Prudential failed to consider her chronic pain in evaluating her claim for long term disability benefits and also failed to perform an occupational analysis before denying her claim. Ms. Wiseman submitted with her appeal updated medical records from Dr. Green-Mack and Dr. Simchak as well as current medical records from additional doctors, including Gene Vlahovich, M.D. (new primary care physician), John Hague, M.D. (rheumatologist), Claire Horne, M.C. (rheumatologist); Doli Biondillo, M.D. (pulmonologist), Anne Greist, M.D. (hematologist), and Janet Rippy, M.D. (cardiologist).

---

[2] On March 19, 2012, Ms. Wiseman revoked Prudential's authorization to speak to obtain any additional information from her physicians or other medical providers regarding her claim for disability benefits.

Ms. Wiseman also submitted three statements of disability from Dr. Green-Mack, Dr. Simchak, and Dr. Biondillo.

Dr. Green-Mack's statement of disability lists Ms. Wiseman's diagnoses as MFPS/FMS; Lumbosacral Spondylosis; Inflammation of sacroiliac joint, Nonallopathic lesion of sacral region; Morbid Obesity; Hypothyroidism; and Opioid dependence. R. at 595. Dr. Green-Mack described "objective findings from examinations or testing" as follows:

> Patient has severe low back pain. Pain is constant. SI joint tenderness bilateral. C Spine exam tender. Upper extremities tender both shoulders, elbows and wrist, trigger point, levatoer scapula and upper trap chest tender over costal sternal area. Lower extremities tender both hips, knees, and ankles. Lower spine diffusely tender, sacral torsion, piriformis trigger point bilateral.

*Id.* In response to the question as to why Ms. Wisemans's condition is "disabling for her regular occupation," Dr. Green-Mack opined:

> Patient has physical limitations due to obesity and severe back pain. She has diminished capacities to walk long distances due to cardiomyopathy and restricted lung disease. She is unable to sit for a great length of time due to her degenerative back disease.

R. at 596. Finally, Dr. Green-Mack assessed Ms. Wiseman's prognosis as "[p]oor" and concluded that her condition "will not improve." *Id.*

Dr. Simchak's statement of disability lists Ms. Wiseman's diagnoses as "Fibromyalgia, Memory loss, and phantosmia." R. at 626. In response to the question regarding "objective findings from examination or testing," Dr. Simchak responded that

Ms. Wiseman was "positive on several tender points." *Id.* As to why the listed conditions disabled Ms. Wiseman from her regular occupation, Dr. Simchak wrote: "Cognitive difficulties in performing her job, stress and her pain." R. at 627. Dr. Simchak also opined that Ms. Wiseman's "prognosis for recovery" was "poor" and that she had "achieved maximum medical improvement." R. at 640-41.

Dr. Biondillo's statement of disability lists Ms. Wiseman's diagnosis as "secondary pulmonary hypertension." R. at 640. He opined that the listed condition rendered Ms. Wiseman disabled from her regular occupation because she suffers from shortness of breath, which is a "chronic condition," and that Ms. Wiseman had "probably" achieved maximum medical improvement. R. at 640-41.

In addition to these disability statements, Ms. Wiseman also provided updated medical records (or, in one case an old medical record that had not previously been provided to Prudential) on appeal, which are summarized below:

Dr. Horne, a rheumatologist, examined Ms. Wiseman on April 17, 2003 on a referral from Dr. Foley for evaluation and management of Ms. Wiseman's musculoskeletal pain. R. 622. Dr. Horne advised Ms. Wiseman that, at that time, she "[did] not satisfy strict diagnostic criteria for fibromyalgia but may in fact have a myofascial pain syndrome with management strategies being very similar to those employed for fibromyalgia." R. at 624. Dr. Horne also recommended that a MRI of the cervical spine be performed to ensure there was no evidence of nerve root impingement. *Id.* Ms. Wiseman had the MRI performed on April 25, 2003, which showed "[m]ild

broad-based disc protrusion centrally C5-6," but was otherwise normal. R. at 621. Dr. Horne's examination notes from October 1, 2003 state that a "soft tissue exam" revealed "tender points in locations typical of fibromyalgia." In those notes, Dr. Horne refer to Ms. Wiseman as a "female with fibromyalgia." R. at 620.

Dr. Vlahovich began treating Ms. Wiseman as her primary care physician on December 14, 2011. He examined her on two additional occasions on January 12, 2012 and March 19, 2012. In his January 12, 2012 notes, Dr. Vlahovich stated that Ms. Wiseman was suffering from "lots of pain" in her feet, chronic pain, fibromyalgia, abnormal EKG, and restrictive cardiomyopathy. Dr. Vlahovich's March 19, 2012 notes state: "SOB [shortness of breath] at 6 steps (stairs) … SOB – took 20 min. to breathe comfortably." R. at 591.

On February 14, 2012, Ms. Wiseman saw Dr. Rippy, a cardiologist who treats Ms. Wiseman for restrictive cardiomyopathy and chest pain. At that appointment Ms. Wiseman reported hurting all over from fibromyalgia and arthritis. Dr. Rippy noted that Ms. Wiseman was remaining very sedentary, and using both her oxygen and her CPAP. R. at 586.

Ms. Wiseman had an office visit at the Indiana Hemophilia and Thrombosis Center on February 28, 2012. At that appointment, Dr. Greist noted that Ms. Wiseman remained on supplemental oxygen as needed. Dr. Greist's notes show that Ms. Wiseman was suffering from idiopathic bilateral pulmonary emboli, restrictive cardiomyopathy, and pulmonary hypertension. *Id.*

21

Dr. Hague examined Ms. Wiseman on May 22, 2012, and confirmed Ms. Wiseman's fibromyalgia diagnosis. Specifically, Dr. Hague concluded that there were "clear findings of myofascial" and that Ms. Wiseman had "the requisite number of tender points with allodynia." R. at 617. Dr. Hauge indicated that Ms. Wiseman should continue with her exercise program under the guidance of physical therapy. R. at 585.

**Prudential's Review and Denial of Appeal**

Upon receiving Ms. Wiseman's appeal, Prudential reviewed the information provided by Ms. Wiseman and also sought an independent file review by Dr. Russell Green, Diplomate, American Board of Preventive Medicine, and board certified in Occupational Medicine. Dr. Green also sits on the American Board of Independent Medical Examiners and is a Fellow of the American College of Preventative Medicine. R. at 681. Dr. Green reviewed the medical documentation produced by Ms. Wiseman, dating back to 2003, in relation to her claim for benefits, and, on August 14, 2012, issued an eighteen-page report of his review of Ms. Wiseman's claim.

In his report, Dr. Green stated that Ms. Wiseman suffered primarily from obesity and secondarily from the stress of having to return to the workplace. He noted that, while Ms. Wiseman continued to complain of physical pain after she ceased to work, on March 19, 2012, her treating physician (Dr. Vlahovich) declined to complete disability paperwork on her behalf. Dr. Green observed that Ms. Wiseman had a history of generalized pain that occurred whether or not she was working, and that "[t]here is a clear

element of psychosocial distress relating to workplace issues as well as personal social issues."  R. at 676-678.

In his report, Dr. Green opined that Ms. Wiseman's records failed to show significant lumbar motion disturbance, or sensory or motor dysfunction that would support the conclusion that her back pain is limiting.  *Id.*  He further opined that while there was a physical examination of Ms. Wiseman that showed some limited range of motion of her spine, and a 2011 electrodiagnostic test showed some degree of a distal polyneuropathy, neither demonstrated dysfunction or functional impairment.  R. at 678-79.

While Dr. Green did find support of Ms. Wiseman's diagnoses of morbid obesity, hypothyroidism, and obstructive sleep apnea, he concluded that none of these conditions established any functional impairment.  *Id.*  Specifically, Dr. Green stated that while her treating physicians opined that Ms. Wiseman was unable to work because of her medical conditions, they consistently reported examinations which were "normal" and did not change, show progression, or decreased capacity.  *Id.*

Dr. Green concluded that the neuropsychological record from May 16, 2011 did not support cognitive deficits and he opined that Ms. Wiseman's symptoms related "more to stress and worry than they relate to higher center dysfunction."  R. at 680.  With regard to Ms. Wiseman's fibromyalgia, Dr. Green noted that although her physicians had reported tender points, "[t]esting for acute spondyloarthropathy has been negative, and the mere presence of "tender points" does not in any way correlate with incapacity.  In

fact Ms. Wiseman has had generalized soreness dating to at least 1986 and has been

significantly functional in spite of that history." R. at 678. Finally, Dr. Green referenced

a prior review of Ms. Wiseman's file that had been performed by Denise Chase, a

Registered Nurse from Prudential, concluding that:

> [Ms. Chase's] observation that the diagnosis of fibromyalgia cannot be
> supported with physical findings or laboratory findings is pertinent. Her
> observation that leg issues remain significant and unaddressed is important.
> As noted in my assessment, Ms. Wiseman had been working under these
> circumstances for quite a long time with the same conditions apparently
> unchanged, and therefore to consider that she is now clinically and
> functionally impaired is not consistent with the record, and in that Ms.
> Chase and I agree.
>
> …
>
> Ms. Chase and I are in concurrence with regard to the view of the medical
> record and of its findings as detailed above. We did not feel that there was
> a physical condition that would restrict Ms. Wiseman's functional capacity.
> I am in total concurrence with [Ms. Chase's] assessment that fibromyalgia,
> while an interesting concept, is not disabling.

R. at 679, 680.

Prudential also conducted a vocational review of Ms. Wiseman's occupation as a

Business Consultant. Pursuant to the terms of the Plan, her position was reviewed as it

was normally performed instead of how Ms. Wiseman specifically performed her duties.

Prudential concluded that the position of Business Consultant is classified as a light

physical demand occupation, which requires exerting up to twenty pounds of force

occasionally, and/or up to ten pounds frequently, and/or a negligible amount of force

constantly to lift, carry, push, pull or otherwise move objects. R. at 746. Light work also

"(1) requires standing or walking to a significant degree, OR (2) it requires sitting most of

the time but entails pushing, pulling or manipulating of arm or leg controls, OR (3) it requires work at a product rate/pace entailing constant pushing, pulling of materials of negligible weight." *Id.*

On August 24, 2012, Prudential denied Ms. Wiseman's appeal, relying on Dr. Green's file review as well as the Plan language, Ms. Wiseman's medical records, internal file reviews, and the vocational review described above. In its denial, Prudential cited a lack of evidence supporting the conclusion that Ms. Wiseman had restrictions preventing her from performing her own occupation. Specifically, Prudential concluded as follows:

> [E]ffective October 10, 2011, Ms. Wiseman is not considered disabled in accordance with the policy's definition of disability. Based on the physician-reviewer's assessment, there are no restrictions or limitation indicated from any one condition or combinations of conditions. Based on the medical records available for review and the examination findings there are no significant lower extremity abnormalities. Ms. Wiseman's diagnosis of fibromyalgia cannot be supported with physical findings or laboratory findings available for review. Ms. Wiseman's medical history documents that she has been working for quite a long time with the same conditions apparently unchanged, and therefore, report that she is now clinically and functionally impaired is not consistent with the record. Ms. Wiseman, although troubled with significant obesity and generalized pain does not have a medical record which supports her incapacity. Over time, the records particularly of Dr. Lynnette Green-Mack and Ms. Dianne Leach do not support significant functional deficits. They currently report symptoms of pain whether or not Ms. Wiseman is working. According to the external reviewing physician Ms. Wiseman's reported symptoms and limitations are not supported by, consistent with or proportionate to the documentation provided for review (e.g., physical exams, diagnostic testing, and treatment records). As such, there remains insufficient medical evidence to support Ms. Wiseman's claim for LTD benefits.

R. at 746-47. Prudential further noted that, because it found no restrictions or limitations that would preclude Ms. Wiseman from performing her occupational duties, an additional vocational evaluation of her occupational demands was not warranted. *Id.*

Ms. Wiseman subsequently filed the instant suit on September 18, 2012.

**Legal Analysis**

**I.       Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. AIn such situations, courts must consider each party=s motion individually to determine if that party has satisfied the summary judgment standard.@ *Kohl v. Ass=n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in the case before us, the Court has considered the parties= respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.    Standard of Review

Plaintiff's claim arises under ERISA, a statute "enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113 (1989). ERISA provides that plans covered by the statute must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1).  ERISA further requires that plan procedures "afford a reasonable opportunity . . . for a full and fair review" of dispositions adverse to the claimant. *Black & Decker v. Nord*, 538 U.S. 822, 830-31 (2003) (citing 29 U.S.C. § 1133(2)).  In discharging their duties towards employees covered by plans,

administrators must act solely in the interests of the plan participants, and faithfully discharge the standards set forth in plan documents. *See* 29 U.S.C. § 1104(a)(1).

Here, both parties agree that the Plan vests discretion in Prudential, the claim administrator, to make benefits decisions and construe the Plan's terms. Accordingly, we accord some deference to Prudential's decisions, overturning them only if they constituted an "abuse of discretion"—or, in other words, if the administrator's actions were "arbitrary and capricious." *See Raybourne v. Cigna Life Ins. Co. of N.Y.*, 576 F.4d 444, 449 (7th Cir. 2009) ("A plan's express grant of discretion to the administrator lowers the standard of judicial scrutiny from de novo to abuse-of-discretion."); *Davis v. Unum Life Ins. Co.*, 444 F.3d 569, 576 (7th Cir. 2006) ("When, as here, the terms of an employee benefit plan afford the plan administrator broad discretion to interpret the plan and determine benefit eligibility, judicial review of the administrator's decision to deny benefits is limited to the arbitrary-and-capricious standard.")

Our review under this standard is not, however, a "rubber stamp." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). The Seventh Circuit has described courts' duty ensure that a plan administrator followed adequate procedures, particularly that it "communicated 'specific reasons' for its determination to the claimant." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009). A decision may also be arbitrary and capricious if there is "an absence of reasoning in the record to support it," or if the decision failed to draw a logical link between the conclusion and its supporting evidence. *Leger v. Tribune Co. Long Term Disability Plan,* 557 F.3d 823 (7th

Cir. 2008); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003). In sum, we must overturn a denial of disability benefits where the administrator's application of the employee's plan was "downright unreasonable." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009). In reviewing an administrator's denial of an appeal, the same strictures of reasonableness apply; the denial must "address any reliable, contrary evidence presented by the claimant." *Majeski,* 590 F.3d at 484, *Love v. Nat'l City Cor. Welfare Benefit Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009).

In reviewing a plan administrator's exercise of its vested discretion in denying disability benefits pursuant to ERISA, we limit the scope of our consideration to the administrative record upon which the decision was based. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 195 F.3d 975, 981 (7th Cir. 1999) ("Deferential review of an administrative decision means review on the administrative record."). Consideration of extraneous evidence is not appropriate.

III.  **Discussion**

Ms. Wiseman first argues that Prudential's denial of her claim was arbitrary and capricious because it was based on her failure to produce objective findings when no such objective tests exist for her conditions, to wit, fibromyalgia and chronic pain. It is undisputed that a plan "may not deny benefits solely on the basis that the symptoms of the claimed disability are subjective." *Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 485 (7th Cir. 2009). But that is not what Prudential did here. The reason Prudential

denied Ms. Wiseman's claim was not because she failed to produce objective evidence that she suffers from fibromyalgia and chronic pain, but because she failed to produce objective evidence that her fibromyalgia and chronic pain cause functional restrictions or impairments that would prevent her from performing her position.[3]  Under Seventh Circuit law, "a plan may deny benefits because a claimant has failed properly to document pain-induced functional limitations."  *Id.*; *see also Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007) ("A distinction exists … between the amount of fatigue or pain an individual experiences, which … is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured."  *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007).

Ms. Wiseman argues that she did in fact produce such evidence, pointing to the disability statements completed by Dr. Green-Mack, Dr. Simchak, and Dr. Biondillo.  Dr. Green-Mack opined that Ms. Wiseman has physical limitations caused by obesity and severe back pain.  Specifically, Dr. Green-Mack stated that Ms. Wiseman is unable to sit "for a great length of time" as a result of her degenerative back disease and that her cardiomyopathy and restricted lung disease cause "diminished capacities to walk long

---

[3] Dr. Green did state in his review of Ms. Wiseman's file that he believed that "fibromyalgia, while an interesting concept, is not disabling."  R. at 680.  Had Prudential relied solely on this statement in denying Ms. Wiseman's benefit claim, that clearly would have been improper as the conclusion that fibromyalgia can never be disabling has been roundly rejected in the caselaw.  However, as described more fully below, in rendering its denial decision, Prudential instead relied upon its determination that Ms. Wiseman had failed to show that her diagnoses (including fibromyalgia) caused any functional limitations that would prevent her from performing her position, which is a proper basis on which to deny a claim.

distances." R. at 596. Dr. Simchak opined that Ms. Wiseman is disabled from her regular occupation as a result of "[c]ognitive difficulties in performing her job, stress, and her pain." R. at 627. In his disability statement, Dr. Biondillo opined that Ms. Wiseman's secondary pulmonary hypertension is disabling because it results in shortness of breath, which he described as "a chronic condition." R. at 640.

Although plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005 (citations omitted). Here, we cannot say that it was unreasonable for Prudential to credit its medical consultant, Dr. Green, over Ms. Wiseman's treating physicians given the lack of objective evidence supporting her doctors' opinions. For example, Ms. Wiseman's physician, Dr. Green-Mack, opined that Ms. Wiseman's back pain limited her from sitting "for a great length of time." First of all, that statement is vague as it does not make clear the length of time that Dr. Green-Mack believes Ms. Wiseman *is* able to sit at a stretch in order to determine whether that length of time is incompatible with her regular occupation. Moreover, while Ms. Wiseman's examinations showed some limited range of motion with her spine and a 2011 electrodiagnostic test showed some degree of a distal polyneuropathy, the remainder of her results were normal, and Dr. Green opined that the records of her treating physicians did not suggest significant lumbar disturbance, no sensory or motor dysfunction, or any other findings that would support the conclusion that Ms. Wiseman's

back pain was limiting.  Given these facts, it was not unreasonable for Prudential to rely on Dr. Green's opinion that the objective tests failed to demonstrate the kind of dysfunction that would result in functional impairment.

Similarly, although Dr. Simchak opined that cognitive difficulties prevented Ms. Wiseman from performing her regular occupation, the objective tests in the record do not support that conclusion.  Ms. Wiseman's records fail to show any restriction or limitation related to her complaints of difficulties with memory, attention, and concentration.  The records revealed no psychomotor retardation or agitation and neurophysiological testing did not demonstrate any evidence of a neurocognitive disorder or other decline. Likewise, the record shows that Ms. Wiseman had normal cardiac workups and respiratory testing with no significant abnormal pulmonary diagnostic tests results, and thus, it was not unreasonable for Prudential to conclude that those results did not support Dr. Biondillo's conclusion in his disability statement that Ms. Wiseman's shortness of breath as a result of secondary pulmonary hypertension was disabling.

Nor is this a case in which the claim administrator failed to communicate to the claimant its reasons for rejecting her claim.  In each of its denial letters, Prudential stated that there was a lack of objective evidence demonstrating that Ms. Wiseman's medical diagnoses resulted in diminished functional capacity which prevented her from performing her position.  For these reasons, we find that Prudential adequately explained its reasons for discounting the opinions of Ms. Wiseman's doctors that she is disabled as defined by the Plan.

Ms. Wiseman argues that Prudential's denial of her disability claim was arbitrary and capricious for several additional reasons. She contends that it was arbitrary and capricious for Prudential to rely solely upon a file review of medical records because assessment of her credibility is essential to a full and fair review of her claim. In support of this contention, Ms. Wiseman cites the Seventh Circuit's decision in *Holstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 775 (7th Cir. 2010), in which the court held that "the evidence provided by the doctors who examined [the plaintiff] in person [was] so overwhelming that the reliance on record-review doctors who selectively criticized this evidence [was] part of a larger pattern of arbitrary and capricious decision-making." However, it is well-established under Seventh Circuit law that reliance on a file review by an independent, qualified physician is not inherently or necessarily arbitrary and capricious. The Seventh Circuit has recognized that:

> In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.

*Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569 (7th Cir. 2006) (citing *Dougherty v. Indiana Bell Tel. Co.*, 440 F.3d 910, 915 (7th Cir. 2006)). Here, as explained above, given the lack of objective evidence to support the opinions of Ms. Wiseman's treating physicians, it was reasonable for Prudential to credit the opinions both from its own internal capacity reviews as well as Dr. Green's independent review. Accordingly, we

cannot conclude that Prudential reached its decisions or otherwise dealt with Ms. Wiseman in an arbitrary and capricious manner on this basis.

Ms. Wiseman also argues that Prudential's failure to conduct a vocational review of her position was arbitrary and capricious. Again, we do not agree. It is true that courts have held that a failure to conduct an evaluation of the claimant's position can be evidence of an arbitrary and capricious review. *See, e.g.*, *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 854-55 (3d Cir. 2011); *Kalish v. Libery Mut./Libery Life Assur. Co. of Boston*, 419 F.3d 501, 507 (6th Cir. 2005). Here, however, it is undisputed that Prudential contacted CNO on December 12, 2011 to obtain additional information regarding her duties and performance as a Business Consultant. R. at 734-35. Prudential obtained Ms. Wiseman's job description from her employer and reviewed her occupation as it was normally performed, as required by the Plan, concluding that her position was classified as a light physical demand occupation, the specific demands of which were described in the factual background section *supra*. Prudential also provided Ms. Wiseman's job description to Dr. Green as part of the file review. Accordingly, we cannot find that Prudential failed to assess the material duties of Ms. Wiseman's position in reaching its denial decision.[4]

---

[4] Ms. Wiseman also contends that Prudential improperly relied on the fact that she had been adequately performing her position for a number of years before filing her benefits claim to support its determination that she is not disabled. In its denial letter, Prudential stated, "Ms. Wiseman's medical history documents that she has been working for quite a long time with the same conditions apparently unchanged, and therefore, report that she is now clinically and functionally impaired is not consistent with the record." R. at 747. The Seventh Circuit has held that merely because an individual has been working for a number of years with an unchanged

Finally, Ms. Wiseman contends that Prudential denied her benefits solely to protect its financial interests. In support of her argument that a conflict of interest impacted Prudential's decision, she points to the fact that Prudential approved her claim when CNO was responsible for payment, but denied the claim when Prudential would have become responsible for paying the claim. In cases in which "the entity that administers [an ERISA] plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket … this dual role creates a conflict of interest." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Courts are to "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Id.*

We do not find that such a conflict of interest existed here or that it improperly influenced Prudential's decision. Prudential initially determined that Ms. Wiseman was entitled to STD benefits (that CNO was responsible for paying) for the period of October 10, 2011 through January 1, 2012. Prudential subsequently informed Ms. Wiseman that her request for an extension of benefits was denied and that her STD benefits were terminated effective January 2, 2012 (a few days short of the STD maximum payment date when CNO was still the responsible party for payment of any approved claim) and

---

condition does not mean that that condition is not disabling. *E.g., Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003). This reason was not, however, the primary basis on which Prudential denied Ms. Wiseman's claim. Rather, it was, as discussed above, the fact that the objective medical records failed to show significant functional limitations preventing Ms. Wiseman from performing her position at any point along the time continuum.

that LTD benefits were also denied (which Prudential was responsible for paying). Ms. Wiseman contends that because the definition of disability is materially the same under both the STD and the LTD Policy and the medical records reviewed in adjudicating both claims was identical, Prudential's opposing determinations cannot be reconciled. Again, we disagree.

First, the definitions for disability under the STD and LTD Plans are not identical. The applicable language under the STD Plan requires that a claimant demonstrate an "inability to work" while the LTD Plan requires that the claimant demonstrate an inability "to perform the material and substantial duties of your regular occupation." More importantly, the STD Plan clearly states that STD benefits are directly connected to eligibility under the FMLA, providing that a claimant who satisfies the requirements under the FMLA receives benefits during the medically necessary portion of leave. Prudential explained this connection between FMLA benefits and STD benefits in its correspondence approving Ms. Wiseman's claims for STD benefits. Prudential had approved Ms. Wiseman's FMLA claim before it approved her claim for STD benefits and Prudential's internal notes establish that its approval of her claim for STD benefits was based on the FMLA provision. The record also shows that Prudential contacted Ms. Wiseman to explain that there were "important differences between STD and LTD benefits" and requested additional information in order to assess her eligibility. Given these facts, we cannot conclude that a conflict of interest affected Prudential's decision in the case at bar.

## IV. Conclusion

For the reasons detailed above, we hold that Prudential provided Ms. Wiseman a full and fair review of her claim and that its decision denying her claim for benefits was not arbitrary and capricious. Accordingly, we <u>DENY</u> Plaintiff's Motion for Summary Judgment and <u>GRANT</u> Defendants' Motion for Summary Judgment. Final judgment shall enter accordingly.

IT IS SO ORDERED.


Date: _____9/24/2014_____


_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Nicholas Thomas Lavella
O'RYAN LAW FIRM
nlavella@oryanlawfirm.com

Amanda A. Sonneborn
SEYFARTH SHAW LLP
asonneborn@seyfarth.com

Megan E. Troy
SEYFARTH SHAW LLP
mtroy@seyfarth.com